**LAURENCE MYERS SCAFFOLDING CO., Plaintiff,**

v.

**UNITED STATES, Defendant.**

**C. D. 2809; Protest 65/20027-109713.**

United States Customs Court,
Second Division.

Oct. 31, 1966.

Cooley, Crowley, Gaither, Godward, Castro & Huddleson, San Francisco, Cal. (Thomas A. H. Hartwell, San Francisco, Cal., of counsel), for plaintiff.

J. William Doolittle, Acting Asst. Atty. Gen. (Morris Braverman, trial attorney, New York City), for defendant.

Glad & Tuttle, San Francisco, Cal. (Edward N. Glad and Robert Glenn White, San Francisco, Cal., of counsel), as amici curiae.

Before RAO and FORD, Judges.

RAO, Chief Judge:

Two importations described on the entry papers as consisting of structural steel units were classified for customs duty purposes by the then "collector of customs" at the port of San Francisco within the purview of item 657.20 of the Tariff Schedules of the United States as articles of iron or steel, which are not more specifically provided for elsewhere in the tariff schedules, for which duty at the rate of 19 per centum ad valorem is provided.

By a timely filed protest, plaintiff herein seeks a reclassification of said merchandise by this court apparently on the grounds that the importations at bar are within the provision for columns, pillars, posts, and similar structural units, of the kind provided for in item 652.94 of said tariff schedules, and subjected to duty at only 7.5 per centum ad valorem. Although plaintiff's claim is not set forth in so many words in its protest or during the course of the proceedings in this case, the intent is clear from the specification of the tariff schedule item number and the rate of duty claimed, and the inference to be drawn from the fact that the plaintiff urges at the conclusion of its brief that "Since the design, nature and use of the shoring at issue is solely to provide columnar support to structures, this protest should be sustained."

The items of the Tariff Schedules of the United States, above referred to, are here set forth.

### PART 3.—METAL PRODUCTS

#### Subpart G.—Metal Products Not Specially Provided For

Subpart G headnotes:

1. This subpart covers only articles of metal which are not more specifically provided for elsewhere in the tariff schedules

\* \* \* \* \* \* \* \* \* \*

Articles of iron or steel, not coated or plated with precious metal:
cast-iron articles, not alloyed:

\* \* \* \* \* \* \* \* \* \*

Other articles:

\* \* \* \* \* \* \* \* \* \*

657.20 Other ......................................19% ad val.

### PART 3.—METAL PRODUCTS

#### Subpart F.—Miscellaneous Metal Products

Subpart F headnotes:

\* \* \* \* \* \* \* \* \* \*

Hangars and other buildings, bridges, bridge sections, lock-gates, towers, lattice masts, roofs, roofing frameworks, door and window frames, shutters, balustrades, columns, pillars, and posts, and other structures, and parts of structures, all the foregoing of base metal:

Of iron or steel:

\* \* \* \* \* \* \* \* \* \*

Columns, pillars, posts, beams, girders, and similar structural units:
Not in part of alloy iron or steel:

652.93 Cast-iron (except malleable cast-iron) articles, rough or advanced \* \* \*

652.94 Other ...................................7.5% ad val.

———◆———

At the hearing of this case, the following five witnesses were called to testify on behalf of plaintiff.

James C. Jay, presently executive vice president and general manager of Michel & Pfeffer and prior thereto president of Safeway Pacific and executive vice president of the Safeway Steel Products. Jay stated he has a bachelor of science degree in chemistry and after graduation was employed with several companies as a chemist or metallurgist.

Alan G. Dohrmann, general manager of the Laurence Myers Division of Michel & Pfeffer, who was familiar with the ordering of the merchandise at bar.

Edwin M. Howell, engineer and estimator for Peter Kiewit Sons, Inc. He holds a bachelor of science degree in civil engineering from the University of Pennsylvania.

Clayton R. Ballou, employed by the Laurence Myers Co. for 13 years as sales engineer, estimator, and detailer. It was he who designed the shoring material in controversy.

Kenneth Grantham, shoring rental manager of the Laurence Myers Division of Michel & Pfeffer. He has a master of science degree from the University of California, spent 10 years in engineering work, has been in charge of the sale or rental of building shoring, and has personal knowledge of the uses to which such shoring is put.

Nine exhibits were received in evidence and were marked exhibits 2 through 10, inclusive. Reference thereto and a description thereof will be made where necessary during the course of this decision.

The following facts appear from the evidence before the court. The merchandise sought to be reclassified consists of three types of shoring, namely, bridge overhang shores, highway shores, and building shores. It has been agreed by the parties hereto that said shoring does not consist in part of alloy iron or steel. The various types of shoring are composed of the following invoice items:

Bridge overhang shores: BRS–1, consisting of a steel column of two collapsible steel tubes, adjustable to length by pins and having a screw jack for fine adjustments.

Highway shores: Tubing parts identified by invoice items F45T and TF4, coupling pins No. 411, jack HD–21, stopper pin SP, and cross braces CB, invoice items 253–7 and 255–7.

Building shores: Composed of tubing parts identified by invoice items TF–36–W and TF–3, jack BSJ–15, coupling pin ISP–1, stopper pin SP and cross braces CB, invoice items 253–7 and 255–7.

The bridge overhang shores and the highway and building shoring are all made of the same steel specifications as to composition but vary in gauge of steel, the building shoring being the lightest of the three.

With reference to the bridge overhang shores, BRS–1, a sample of which was received in evidence as plaintiff's exhibit 2 and an illustration of which appears on page 2 of exhibit 8, Witness Ballou stated that he had designed it with the purpose in mind of providing "the strongest column, with the least weight, and for the least money, to take the greatest load." He selected the tubular shape because of its high tensile strength and being of the lightest material, stating that the tubular form is a stronger structural shape than a square form.

This witness also designed the highway shoring in controversy, design drawings of which were received in evidence as plaintiff's collective exhibit 3. And as plaintiff's collective exhibit 9, drawings of the building shoring in issue were received in evidence. As also illustrative of the building shoring and its use, six photographic slides depicting the Oakland, California Museum in process of construction were received in evidence as plaintiff's collective exhibits 4–A through 4–F.

Each type of shoring was designed for a particular purpose in the construction industry, the difference in name applied to the shoring disclosing the varying uses. The basic purpose of all the types of shoring was to provide a columnar support to concrete form work of bridges, highways, or other structures during the pouring of concrete and while the concrete was being cured.

The assembly of the various parts comprising the different types of shores is basically the same. Iron or steel tubular portions are placed one on top of the other and are fastened together with coupling pins to obtain the height desired, with the topmost tube or frame telescoping into the one below it and being adjusted to proper position by means of pin holes and stopper pins. Final height adjustment is made in each instance by an incorporated jack.

Plaintiff herein relies principally on the case of Universal Builders Supply Co., Inc. v. United States, 48 Cust.Ct. 99, C.D. 2319, to support its contention for

classification of the imported shoring as coming within the purview of the claimed provision in item 652.94 of the tariff schedules. The *Universal* case involved certain latticed form supports and solid form supports which were classified by the collector of customs as articles or wares, not specially provided for, composed wholly or in chief value of base metal, in paragraph 397 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade. Plaintiff there sought classification of said articles as "beams" or as "other structural shapes of iron or steel," within the provisions therefor in paragraph 312 of said tariff act, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, which provided a lower rate of duty. On the record there presented, the court found that the lattice form supports and solid form supports were designed and produced solely for structural purposes; that said articles, which possess the characteristic of supporting heavy loads with a minimum of material, were used principally in the construction of large buildings, bridges, and other structures and served to carry the weight of manpower, supplies, and equipment used to lay concrete floors in such structures; and that when in use said lattice form supports and solid form supports performed the essential structural function of supporting the building in which they were used. The court there, accordingly, held that the lattice and solid form supports were properly subject to classification either as beams or as "other structural shapes of iron or steel" in paragraph 312 of the tariff act, as modified, as claimed by plaintiff.

Worthy of particular note at this point is the difference in language of the claimed provision in the *Universal* case, supra, and that used in the tariff schedule item presently under consideration.

In the *Universal* case, the following provision of paragraph 312 of the Tariff Act of 1930, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, was invoked:

Beams * * * *together with all other structural shapes* of iron or steel: [Italics added.]

In the instant case, reliance is placed on the provision in item 652.94 of the Tariff Schedules of the United States for:

Columns, pillars, posts, * * * and *similar structural units*: [Italics added.]

The defendant, in the case at bar, seeks to negate the plaintiff's claim in the instant case bringing the court's attention to Acrow, Incorporated, and Frank P. Dow Co., Inc. v. United States, 32 Cust.Ct. 356, Abstract 57727, wherein certain building shores or jacks classified by the collector of customs as articles or wares, not specially provided for, in paragraph 397 of the tariff act, as modified, were held on the record there presented, to be properly subject to classification as machines, not specially provided for, in paragraph 372 of the Tariff Act of 1930, as modified. Although an alternative claim for classification of the building shores or jacks as structural shapes of iron or steel in paragraph 312 of the Tariff Act of 1930, as modified, was contained in the protest, no evidence was offered in support of said claim, nor was it pursued at the time of briefing, and the court disposed of it summarily.

In the circumstances of the present case, we are of the opinion that neither the *Universal* nor the *Acrow* case, supra, lends assistance in the determination of the present issue. Both of said cases involved provisions of the Tariff Act of 1930, as modified, whereas we are here called upon to consider, construe, and apply the language of different items of the Tariff Schedules of the United States.

This is the first instance in which the second division of this court has been called upon to interpret the provisions of the Tariff Schedules of the United States, made effective on August 31, 1963 by Proclamation No. 3548 (77 Stat. 1017) of the President of the United States, and designed as stated in the

Tariff Classification Study of the United States Tariff Commission for the following purposes:

(1) Establish schedules of tariff classifications which will be logical in arrangement and terminology and adapted to the changes which have occurred since 1930 in the character and importance of articles produced in and imported into the United States and in the markets in which they are sold.

(2) Eliminate anomalies and illogical results in the classification of articles.

(3) Simplify the determination and application of tariff classifications.

One has to peruse but briefly the provisions of the Tariff Schedules of the United States to be impressed with the particularity with which merchandise is provided for in detailed itemizations. In view of this particularization, it naturally follows that the language used was selected with the view to pinpoint the classification of merchandise rather than to encompass imported articles within the broader language which previously controlled the tariff classification of merchandise. As indicative of this treatment is the fact that merchandise previously encompassed by the provisions of paragraph 312 of the Tariff Act of 1930, as modified, known as the "structural shapes" provision, is now provided for in 17 different items of the Tariff Schedules of the United States. (See Tariff Classification Study, Proposed Revised Tariff Schedules of the United States, page 741.)

It is against such a background that the court, in the present instance, turns to a determination of the issue at bar.

Proof offered by the plaintiff herein through its witnesses accents the capacity of the imported shores to carry heavy weights with the least use of material, which was a consideration in construing the provision for "structural shapes" either *eo nomine* provided for or included within the provision for "other"

such shapes in paragraph 312 of the Tariff Act of 1930.

However, in the present controversy, the burden is upon plaintiff to show by satisfactory evidence that the bridge overhang shores, highway shores, and building shores are *similar structural units* to the columns, pillars, and posts *eo nomine* provided for in item 652.94 of the present tariff schedules.

Let us look to standard lexicographic authorities, as we may (United States v. C. J. Tower & Sons of Buffalo, N.Y., 48 CCPA 87, C.A.D. 770), to see how the words "columns," "pillars," and "posts" are defined, since it is the common meaning of tariff terms in the absence of a question of commercial designation which controls the classification of imported merchandise (United States v. Mercantil Distribuidora, S.A., Joseph H. Brown, 43 CCPA 111, C.A.D. 617).

Webster's New International Dictionary of the English Language, second edition, 1958, contains the following:

column, *n.* 1. *Arch.* A kind of supporting pillar; esp.: a One consisting of shaft, base, and capital, the shaft being of circular section except as it is fluted or channeled. * * *

pillar, *n.* 1. A firm, upright, insulated support, slender or narrow compared to its height, for a superstructure; more widely, any vertical support, as a bedpost, the post supporting a horizontal deck beam, or the pedestal or central support of a table or machine; a pier, pedestal, or post; also, a column or a shaft standing alone, as for a monument. * * *

post, *n.* 1. A piece of timber, metal, or other solid substance, fixed, or to be fixed, firmly in an upright position, esp as a stay or support; a pillar; prop; as, a hitching fence, a sheath * * * or telegraph *post*; * * *.

Funk & Wagnalls New "Standard" Dictionary of the English Language, 1956, provides the following definitions:

column, *n.* 1. Arch. (1) A vertical shaft, usually having both a base

and a capital, and primarily for the support of superincumbent weight, as an entablature, balcony, or statute. * * * (2) In iron and steel structures, a supporting shaft frequently extending to the roof and consisting of various sections fitted together. * *

2. Any structure or other object resembling a column in form and position; figuratively, a prop or support.

pillar, *n.* 1. A firm upright separate support; specif., in architecture, a column or columnar mass either supporting a superior part or standing as a decoration or monument: sometimes distinguished from *column*, as not subject to strict classical rules of form. * * *

post, *n.* 1. An upright piece of timber, metal, or other material, used as a support, a point of attachment, * * *

Running through the foregoing definitions is the concept that a column, pillar, or post, when ready for use, is a unitary element providing upright support to a building or structure. The bridge overhang shores, highway shores, and building shores in issue, however, although serving a like purpose, have been shown by the record before us to be composite articles consisting of basic and topping tubular uprights which are fastened together by coupling pins, adjusted to height by means of stopper pins, braced by cross bars, and positioned in fine adjustments by means of an incorporated jack.

The concept that a structural member contemplates a unitary element appears to have been adopted by the Court of Customs and Patent Appeals in the case of Frost Railway Supply Co. v. United States, 39 CCPA 90, C.A.D. 469, which affirmed the decision of the trial court in holding that railroad truck spring snubbers were properly subject to classification within the provision for articles not specially provided for, composed wholly or in chief value of base metal, in paragraph 397 of the Tariff Act of 1930, rather than as structural shapes within the provisions of paragraph 312 of said act, as modified. In the course of its decision in that case, the appellate court expressed the opinion predicated on a review of several mechanical engineers' handbooks that for channels, angles, tees, I-beams, T-beams, and so forth to be structural shapes they must be of *unitary construction*.

The testimonial record discloses that the various types of shores or shoring in controversy are designated and known by different names to indicate the uses to which they will be put in bridge construction, highway construction, and building construction, and that it would not be practical or economical to use the shores interchangeably. Moreover, it is evident from the different item numbers assigned to the various parts comprising each shoring that the components may only be used with the particular type shores for which they were designed And said parts in proper combination become commercial entities subject to sale or rental as bridge overhang shores, highway shores, or building shores. While it may be said that such equipment assists in the construction of structures in which columns, pillars, and posts are used, the record evidence fails to establish that the equipment in itself is either a column, pillar, or post, or that it is a structure similar thereto.

In the opinion of the court, the shores in controversy are not similar structures to columns, pillars, and posts within the common meaning of those terms but are in fact more than said designated structural units and may well be termed construction equipment.

Whether or not such construction equipment constitutes "other structures" or "parts of structures" within the superior heading prefacing the item of the Tariff Schedules of the United States here invoked and encompassed by the catchall provision of item 652.98, we are not here called upon to decide, nor do we, but on the record before us, we are of the opinion, and so hold, that the testimony does not support a finding that the articles in controversy are "structural units" "similar" to those enumerated in

item 652.94, namely, columns, pillars, posts, beams, and girders.

In the circumstances, therefore, we have no other recourse but to overrule the protest claim of plaintiff.

Judgment will be issued accordingly.

FORD, J., concurs.